NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

———————————

No. 17-3353

———————————

LIBERTY BELL CAPITAL II, L.P.,

Appellant

v.

WARREN HOSPITAL; WH MEMORIAL PARKWAY INVESTORS;
TWO RIVERS ENTERPRISES, INC.; WARREN HEALTHCARE ALLIANCE

———————————

Appeal from the United States District Court
for the District of New Jersey
(D.C. Civil Action No. 3-13-cv-04241)
District Judge: Honorable Brian R. Martinotti

———————————

Argued June 12, 2018

Before: AMBRO, JORDAN, and HARDIMAN, Circuit Judges

(Opinion filed August 31, 2018)


Alan L. Frank, Esquire             (Argued)
Evan L. Frank, Esquire
Christopher R. King, Esquire
Alan L. Frank Law Associates
135 Old York Road
Jenkintown, PA   19046

    Counsel for Appellant

Norman E. Greenspan, Esquire      (Argued)
Lyndsay E. Rowland, Esquire
Starfield & Smith
1300 Virginia Drive, Suite 325
Fort Washington, PA   19034

Kimberly G. Krupa, Esquire
Gross McGinley
33 S. Seventh Street
Allentown, PA   18101

        Counsel for Appellees

_____

OPINION[*]

_____

AMBRO, Circuit Judge

Defendant Warren Hospital is a not-for-profit hospital, and defendants Warren Health Care Alliance, P.C., WH Memorial Parkway Investors, L.L.C. ("WHMPI"), and Two Rivers Enterprises, Inc., are affiliates of Warren Hospital (all defendants are referred to, for convenience, as the "Hospital").  To purchase a nearby medical office (the facility and the land on which it stands are referred to as the "Office"), the Hospital formed Hillcrest Medical Plaza, L.L.C. (the "Partnership"), a partnership between WHMPI and InMed Investors, L.L.C. ("InMed"), a commercial real estate development firm.  The Partnership borrowed $12,300,000 (the "Debt") from Wachovia Bank, which took as security a mortgage on the Office (the "Mortgage").  Wells Fargo later succeeded Wachovia (by merger) and acquired its interest in the Debt and the underlying Mortgage.

_____

[*] This disposition is not an opinion of the full Court and pursuant to I.O.P. 5.7 does not constitute binding precedent.

2

The Hospital experienced financial distress and stopped making rent payments to the Partnership on the former's lease of the Office. The Partnership, in turn, stopped making payments on the Debt, and Wells Fargo filed to foreclose on the Mortgage. The Superior Court of Warren County, New Jersey, entered a $12,351,492 foreclosure judgment in Wells Fargo's favor. To satisfy the judgment, the Office was to be auctioned at a sheriff's sale.

Titan Loan Investment Fund LP, a company in the business of buying distressed real estate loans, bought the Debt for $10,250,000, then transferred it to the newly formed Liberty Bell Capital II, L.P. ("Liberty Bell"), the plaintiff. At the sheriff's sale, Liberty Bell was the sole bidder and took the Office subject only to the Partnership's right of redemption, which in New Jersey means that a mortgagor has until 10 days after a sheriff's sale to redeem its property by paying the debt in full and thereby to keep the property. *Hardyston Nat. Bank v. Tartamella*, 267 A.2d 495, 497 (1970).

InMed, the Partnership's passive partner, all along wished to redeem the Office, but only the Partnership could do so, and it was controlled by the Hospital. At the eleventh hour, InMed offered to settle concurrent litigation with the Hospital over the missed lease payments if the latter would relinquish its controlling interest in the Partnership. Although InMed was unsuccessful in moving to delay the sheriff's sale, it nonetheless gained control of the Partnership in time to redeem the Office. *See* Defendants' Br. at 11–12.

Meanwhile, St. Luke's University Health Network ("St. Luke's") had entered into a Definitive Agreement to purchase the Hospital (the "St. Luke's Agreement"). The

3

conditions to closing were that (1) Wells Fargo or any party that obtained title to the Office sign new leases with the Hospital, (2) the Hospital's past due rent be forgiven, and (3) the InMed litigation be resolved to St. Luke's satisfaction. To satisfy some of the conditions, Wells Fargo entered into a Post-Foreclosure Agreement with the Hospital (the "Wells Fargo PFA"). It terminated when Wells Fargo sold the Debt to Liberty Bell. However, as required by the St. Luke's Agreement, the Hospital entered into a Post-Foreclosure Agreement with Liberty Bell (the "PFA") that was identical in all material respects to the Wells Fargo PFA. Both agreements contained the covenant that Liberty Bell's claim relied on—the agreement that "the Hospital [e]ntities shall not contest, cause the stay of, or otherwise delay the [f]oreclosure [p]roceeding, any [s]heriff's [s]ale or the [c]ash [c]ollateral [a]ctions." PFA § 2.1; Wells Fargo PFA § 2.5. PFA § 2.1 also states that the Hospital "shall take such actions in or with respect to the [f]oreclosure [p]roceeding, any [s]heriff's [s]ale, or the [c]ash [c]ollateral [a]ctions as [Liberty Bell] may reasonably request to effect[] the terms and provisions and purposes of this Agreement." It is undisputed that Liberty Bell never requested the Hospital do anything. JA 1484–92; JA 1373–80; JA 1382–89.

PFA § 3 contemplates Liberty Bell becoming the Hospital's landlord (and honoring the leases), an event that would not occur without Liberty Bell acquiring the Office.

## STANDARD OF REVIEW

New Jersey law governs, PFA § 5.8, so when the terms of a contract are clear and unambiguous, the construction and effect of the contract are matters of law that must be

4

resolved by the court, *Mango v. Pierce-Coombs*, 851 A.2d 62, 74 (N.J. App. Div. 2004).

For a contract dispute, granting a motion for summary judgment is appropriate when "the

contract is so clear it can only be read one way." *Pennbarr Corp. v. Insurance Co. of No.*

*Am.*, 976 F.2d 145, 149 (3d Cir. 1992).  We must give effect to the intent of the parties as

"made known in some way in the writing" and "are not at liberty to introduce and effect[]

some supposed unrevealed intention." *Newark Publishers' Assoc. v. Newark*

*Typographical Union*, 126 A.2d 348, 353 (N.J. 1956).

**DISCUSSION**

**I.  The case was ripe for summary judgment.**

The parties filed cross motions for summary judgment.  "At oral argument [in the

District Court], the parties agreed no material facts were in dispute and the case was ripe

for adjudication*." Liberty Bell Capital II, L.P. v. Warren Hosp.*, No. 3:13-CV-4241-

BRM-TJB, 2017 WL 4330359, at *1 n.1 (D.N.J. Sept. 29, 2017).  "It's my view that once

Your Honor decides what the contract says," the Hospital's counsel explained, "that will

then determine the result of this case." *Id.* at *7 n.2.  Liberty Bell "really d[id] jointly

agree that [the Court] should make the call, ball or strike." *Id.*  The Court called a ball for

Liberty Bell's motion, but the Hospital's pitch was true.

Liberty Bell claims the District Court erred under *Facenda v. N.F.L. Films, Inc.*,

542 F.3d 1007 (3d Cir. 2008), because "parties may not stipulate to forgoing a trial when

genuine issues of material fact remain that prevent either side from succeeding on a

motion for summary judgment." *Id.* at 1023.  Liberty Bell has not shown a *Facenda* error.

"[N]o party base[d] its motion on the existence of questions of fact," and "the disputed

5

facts [were not] material." *Liberty Bell Capital II, L.P.*, 2017 WL 4330359, at *7.

Moreover, Liberty Bell does not challenge the Court's assessment of the truth or

materiality of any fact.

**II.    The PFA does not support Liberty Bell's claim.**

The Hospital claims the PFA is about what would happen to its Office leases *if*

Liberty Bell came to be its landlord.  Liberty Bell claims the Hospital intended that it

acquire the Office, and thus the PFA is not about what will occur *if* but rather *when* the

Hospital fulfills its duty.  That deduction is faulty, as it is normal to condition contractual

terms on an event occurring without also agreeing to make that event happen. *See, e.g.*,

PFA Recital ¶ Q ("[I]n the event [Liberty Bell] acquires the Property at the Sheriff's Sale,

. . . ."); PFA § 3.1 (same); *Id.* § 3.2(b) ("[I]n the event . . . [Liberty Bell] is not the

winning bidder . . . ."); *Id.* § 4.1 ("[I]f [Liberty Bell] acquires title to the property

pursuant to any Sheriff's Sale[,] . . . .").  Hence the Hospital's knowledge that Liberty

Bell intended to acquire the Office does not prove the Hospital intended to agree to make

that happen.

Turning to the contract's terms, through PFA § 2.1 the Hospital agreed not to

"contest . . . any [s]heriff's [s]ale[.]"[1]  That sale, Liberty Bell claims, includes both an

auction and the ten-day statutory redemption period that follows, so the Hospital's

transfer of control during the redemption period at least concerned a sheriff's sale.

---

[1]     As noted, the PFA also prohibited the Hospital from causing a delay in, or stay of, the Sheriff's Sale.  Liberty Bell does not claim the Hospital did either. *See* Liberty Bell's Reply Br. at 2.

Though the Hospital did not dispute this interpretation, neither party offered an explanation of what it is to "contest" that process.

We do know Liberty Bell's contemporaneous actions were inconsistent with its current view. In the foreclosure proceeding, InMed had moved to put off the sheriff's sale so it could arrange to exercise the Partnership's statutory redemption right. It informed Liberty Bell, the Hospital, and the Court that it was ready to settle its litigation with the Hospital in exchange for the Hospital's interest in the Partnership. At the hearing, the Superior Court Judge restated that InMed was "absolutely" prepared to settle if it was "allowed to . . . redeem the property [on behalf of the Partnership]." True enough, Liberty Bell opposed InMed's motion, but it did so by arguing that there was "no harm" to proceeding apace because InMed still had the "opportunity" to exercise the Partnership's right of redemption if InMed's plan came together. Unless it meant to dupe the Court with an illusory solution (which we doubt), Liberty Bell must not have believed the PFA prevented the Hospital's transfer of control to InMed. There is no other way to take its argument.

Further, Liberty Bell did not assert its purported contractual right when the Hospital twice telephoned to say it might transfer its interest in the Partnership to InMed. As noted, Liberty Bell could make reasonable requests "to effect[] the terms and provisions and purposes" of the agreement. It did not do so. Nor did it take any immediate legal action. It allowed the Hospital to ring that bell, and it is not at liberty to un-ring it now.

7

To put matters in an even worse light for Liberty Bell, after the redemption it reported the successful investment to its partners: "We are pleased to inform you . . . the Borrower [*i.e.*, the Partnership] redeemed the commercial loan asset . . . . Based on the distribution made to all the [p]artners today, [there was] an Internal Rate of Return of 73.48% and the investors earned a Net Multiple of 1.144x on their investment." The statement refers to the investment as a concluded matter, and not as one in which there was more to be done. It did not try to boost the return by suing the Hospital until 18 months later.

Liberty Bell has not said why the Hospital's transfer was a "contest" of the sheriff's sale. At oral argument we asked the company's counsel to show us the way. He answered that "at a minimum" the action was prohibited by some different agreement. Oral Argument Recording 00:03:26-00:03:46. However, when pressed, he conceded (as he must) the other agreement did no such thing. *Id.* at 00:03:58-00:04:00. That is not an adequate rationale, and we will not ourselves recast a different one.

Finally, Liberty Bell urges us to find the PFA contains an implied covenant that the Hospital will not "interfere" with the Sheriff's Sale. Nothing in the document implies such an agreement, and the Hospital's knowledge of the result Liberty Bell desired does not suffice to support Liberty Bell's contention.

\* \* \* \* \*

Long after celebrating the redemption in full to its partners, Liberty Bell sought a windfall by disputing that redemption. It has not supported its claim with relevant

8

agreement language, direct or implied.  Thus the judgment of the District Court is

affirmed.